UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: Duplicate Digital Copy of Hard Disk Drive, Model THNSNB062GMCJ, Serial Number 72KS10DXTQ1Z | Misc. No. _____ |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Thomas O. Harper, Jr, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of

Criminal Procedure for a warrant to search a forensically acquired digital duplicate copy

("forensic image") of a hard disk drive, Model THNSNB062GMCJ, Serial Number

72KS10DXTQ1Z, ("SUBJECT COMPUTER"), which is more particularly described in

Attachment A; and seize the items specified in Attachment B, which constitute instrumentalities,

fruits, contraband and evidence of violations of Title 18, United States Code, Sections 2252(a)

and 2252A(a), elating to the distribution, receipt and possession of visual depictions of minors

engaging in sexually explicit conduct and child pornography.

2.    I am a Special Agent with the Department of Education ("ED"), Office of Inspector

General ("ED OIG"), Technology Crimes Division ("TCD"), and have been since July of 2010.

In the course of my employment with the ED-OIG, I have conducted several investigations

involving the use of computers and the Internet to commit fraud and other crimes, including the

receipt and delivery of graphic images portraying the sexual exploitation of minors.   I received

my initial law enforcement training at the Federal Law Enforcement Training Center in 2003;

since this initial training, I have attended several advanced courses regarding investigative

techniques used in traditional and computer crimes.   I have training and experience in areas

including interview and interrogation techniques, arrest procedures, search warrant applications,

the execution of searches and seizures, computer crimes, computer evidence identification,

computer evidence seizure and processing, and various criminal laws and procedures.

Additionally, I have received a post-graduate certificate in computer forensics from the School of

Continuing Education at Kennesaw State University, and I am a Certified Computer Examiner as

well as a Certified Fraud Examiner.   As a federal agent, I am authorized to investigate violations

of laws of the United States, and as a law enforcement officer I am authorized to execute

warrants issued under the authority of the United States.

3.     This affidavit is intended to show only that there is sufficient probable cause for the

requested warrant and does not set forth all of my knowledge about this matter.

**PROBABLE CAUSE**

4.     ED OIG and the FBI are currently investigating members of the criminal hacking forum

"Verified"  for numerous violations of United States law, including but not limited to illegal

access to a computer in violation of Title 18, United States Code, Sections 1030(a)(5)(A),

1030(a)(5)(B), and 1030(a)(5)(C); aggravated identity theft in violation of Title 18, United States

Code, Section 1028A; wire fraud in violation of Title 18, United States Code, Section 1343; bank

fraud in violation of Title 18, United States Code, Section 1344.  In addition, some of these members are simultaneously being investigated by ED OIG for federal student aid fraud in violation of Title 20, United States Code, Section 1097(a).  As set forth in detail below, during the course of this investigation, ED OIG has discovered evidence of violations of Title 18, United States Code, Sections 2252(a) and 2252A(a), relating to the distribution, receipt and possession of visual depictions of minors engaging in sexually explicit conduct and child pornography.

5.     Verified is a criminal hacking forum designed to allow cyber criminals to anonymously buy and sell a wide range of illicit goods and services.  The forum contains over two hundred vendors and thousands of customers.  The vendors sell specialized computer services that constitute the tools of the trade for a cybercriminal.  Examples of the criminal goods and services that are advertised on the Verified forum include stolen credit cards, malware, encrypting services, fake identification documents, bulletproof hosting of malware, bank account credentials, PayPal credentials, drops to receive criminal proceeds, and money laundering services.[1]  The vendors also sell services for hiding the proceeds of cybercrimes on the Verified forum, including money

---

[1]     Malware is computer software that was created for criminal purposes such as exploiting vulnerabilities on a computer system and harvesting bank account credentials used for online banking.  Crypting is the process of scrambling malware, rendering it undetectable to antivirus.  Drops are individuals that receive proceeds of criminal activity, such as merchandise paid for with a stolen credit card number or funds that were fraudulently transferred from a victim bank account. Bulletproof hosting allows for an individual to anonymously host a server on the Internet, and is typically used for hosting malware, such as that used to harvest credit card information or other personal identifiable information, in a secure and undetectable way.

laundering and "drops," which are re-shippers of goods purchased with stolen credit cards. The use of drops obfuscates the identities of the individuals involved in the credit card fraud.

6. Lastly, the members on Verified use the forum to discuss techniques in cybercrime such as how to use malware and how to avoid detection by law enforcement. The Verified forum does not appear to support any transactions that have a legitimate, non-criminal purpose.

7. Pursuant to the above mentioned investigation, the FBI obtained a search warrant to search a residence on Oxford Street, Brooklyn, NY (PREMISES) for all records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of 18 U.S.C. §§ 1030, 1028A, 1343, and 1344 (Fraud and related activity in connection with computers, aggravated identity theft, wire fraud, and bank fraud) and 20 U.S.C. § 1097 (Criminal Penalties Relating To Student Assistance Programs).

8. Your affiant led a team jointly comprised of ED OIG and FBI agents in the execution of the search warrant at the PREMISES on June 11, 2015. Upon arrival at the premises, your affiant discovered that the PREMISES, while constructed as a single-family dwelling, had been altered into a "triplex" living arrangement in which three sets of tenants were occupying a separate floor of the building. The topmost floor of the building was occupied by Alex DEAN and his alleged wife and child.

9. Several computers and digital media items were taken from the PREMISES for the purpose of digital evidence analysis to identify and seize evidence relevant to the investigation, including the SUBJECT COMPUTER. During the execution of the search warrant, agents interviewed

DEAN, who admitted to being an active member of Verified and to participating in various

fraudulent schemes that were facilitated by his membership on Verified.  One such scheme

involved using stolen Fedex and UPS shipping labels to transfer merchandise purchased with

stolen credit cards.  According to DEAN, he received the stolen labels electronically from other

members of Verified.  DEAN confirmed that he lived on the top floor of the building with his

family.

10.    During the week of July 27, 2015, your affiant began performing a digital evidence

analysis of a forensic image of the hard drive from the SUBJECT COMPUTER, which was

removed from a room on the top floor of the PREMISES and part of the suite confirmed to be

occupied by DEAN and his family.  The examination took place in, and the SUBJECT

COMPUTER is now physically located at, the Office of the Inspector General for the U.S.

Department of Education in Washington, D.C.  The purpose of this examination was to locate

evidence of DEAN's admitted participation in the shipping of stolen merchandise using stolen

UPS and Fedex labels pursuant to the previously-obtained search warrant.

11.    Your affiant knows from previous investigative experience that shipping labels can occupy

a variety of electronic file formats, particularly if they are illegally obtained and packaged to

evade detection.  For example, even though Fedex and UPS traditionally transmit the mailing

labels as Portable Document Format (PDF) files, they can be rendered from PDF into the form of

Joint Photographic Experts Group (JPEG) images, Tagged Image File Format (TIFF) images, or

Bitmap (BMP) images in order to be altered or used in fraudulent schemes.  For this reason, your

affiant searched the forensic image for all PDF, JPEG, TIFF, and BMP files in order to perform a manual review of those files contents and determine if they were, in fact, shipping labels that might have been illegally obtained.

12.     While reviewing the files your affiant discovered JPEG files depicting what appears to be a Caucasian female of pre-pubescent age engaged in sexually explicit conduct through the lascivious exhibition of the genitals or pubic area, as defined by 18 U.S.C. § 2256(2). The victim was posed in a series of approximately 15-20 photographs that could best be classified as a "striptease." The photographs depicted the victim gradually disrobing from the top down. The final photographs in the series depicted the victim in sexually suggestive poses that caused the clearly visible vaginal area and anus of the victim to be the focal point of the photograph. Based on the victim's lack of developed breasts, facial features, and stature in comparison to other objects in the photographs, your affiant concluded the victim was pre-pubescent and likely a minor.

13.     Your affiant immediately ceased searching the forensic image for further evidence and secured the evidence after exporting the discovered images to secure optical media.

14.     After this discovery, your affiant consulted with Assistant United States Attorneys and investigators from the Internet Crimes Against Children (ICAC) task force in order to obtain concurrence regarding whether the discovered images met the parameters of Child Pornography as defined in 18 U.S.C. § 2256(8).  After reviewing the images, the consensus opinion is that at

least three of the discovered images do meet the definition of Child Pornography as defined in 18 U.S.C. § 2256(8).

## **TECHNICAL TERMS**

15.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

16.     "Computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." See 18 U.S.C. § 1030(e)(1).

17.     "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

a.   "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

b.   "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

c.   IP Address:  The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is,

long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP
addresses.

     d.    The Internet is a global network of computers and other electronic devices that
communicate with each other using numerous specified protocols.  Due to the structure of the
Internet, connections between devices on the Internet often cross state and international borders,
even when the devices communicating with each other are in the same state.

     e.    "Internet Service Providers," or "ISPs," are entities that provide individuals and
businesses access to the Internet.  ISPs provide a range of functions for their customers,
including access to the Internet, web hosting, e-mail, remote storage, and co-location of
computers and other communications equipment.  ISPs can offer a range of options in providing
access to the Internet, including via telephone-based dial-up and broadband access via digital
subscriber line ("DSL"), cable, dedicated circuits, or satellite.  ISPs typically charge a fee based
upon the type of connection and volume of data, called bandwidth, which the connection
supports.  Many ISPs assign each subscriber an account name - a user name or screen name, an
e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using
a modem, the subscriber can establish communication with an ISP and access the Internet by
using his or her account name and password.

     f.    "Internet Connection" means a connection required for access to the Internet.  The
connection would be provided by cable, DSL (Digital Subscriber Line), wireless, or satellite
systems.

g.   A "modem" translates signals for physical transmission to and from the Internet Service Provider, which then sends and receives the information to and from other computers connected to the Internet.

h.   A "router" often serves as a wireless access point and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  The router is in turn typically connected to a modem.

i.   "Domain Name" means the common, easy-to-remember names associated with an Internet Protocol address.  For example, a domain name of "www.usdoj.gov" refers to the Internet Protocol address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

j.    "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

k.    "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

l.    "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet.  In general, P2P software allows a user to set up files on a computer to be shared with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.    One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network. However, a tool used by law enforcement restricts the download so that the file is downloaded, in whole or in part, from a single user on the network.

m.    When a user wishes to share a file, the user adds the file to his a shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's SHA 1 has value is recorded by the P2P software.  The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

n.    Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

o.    "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network- hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.    "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key,

which specifies how the message is to be encoded.  Any adversary that can see the ciphertext

should not be able to determine anything about the original message.  An authorized party,

however, is able to decode the ciphertext using a decryption algorithm that usually requires a

secret decryption key, to which adversaries do not have access.

q.    "Carding" is an activity in which a perpetrator steals or traffics in stolen credit card

information or uses stolen credit card data to buy goods and services.

r.    A Distributed Denial of Service, or "DDoS," attack on a server refers to the process

of making massive requests to a particular server or domain.  The number of requests to a

domain, server, or IP address eventually overwhelms the target, and causes it to stop functioning.

s.    Twitter is an online social networking service and microblogging service that

enables its users to send and read text-based messages of up to 140 characters, known as "tweets."

Tweets are publicly visible by default, but senders can restrict message delivery to just their

followers.  Users can tweet via the Twitter website, compatible external applications (such as for

smartphones), or by Short Message Service (SMS), a text messaging service component of

phone, web, or mobile communication systems.

## COMPUTERS, ELECTRONIC STORAGE, AND DIGITAL EVIDENCE ANALYSIS

18.    As described above and in Attachment B, this application seeks permission to search for

records that might be found on the SUBJECT COMPUTER, in whatever form they are found.

19.   *Probable Cause.*   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the analysis of digital evidence, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored on the SUBJECT COMPUTER for at least the following reasons:

a.   Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children, from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses (such as in person, in photographs, or other visual media), or from literature describing such activity.

b.   Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.   Individuals who have a sexual interest in children or images of children almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure

location.  Individuals who have a sexual interest in children or images of children typically retain

pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings,

mailing lists, child erotica, and videotapes for many years.

d.     Likewise, individuals who have a sexual interest in children or images of children

often maintain their collections that are in a digital or electronic format in a safe, secure and

private environment, such as a computer and surrounding area.  These collections are often

maintained for several years and are kept close by, usually at the collector's residence, to enable

the individual to view the collection, which is valued highly.

e.     Individuals who have a sexual interest in children or images of children also may

correspond with and/or meet others to share information and materials; rarely destroy

correspondence from other child pornography distributors/collectors; conceal such

correspondence as they do their sexually explicit material; and often maintain lists of names,

addresses, and telephone numbers of individuals with whom they have been in contact and who

share the same interests in child pornography.

f.     Individuals who have a sexual interest in children or images of children prefer not to

be without their child pornography for any prolonged time period.  This behavior has been

documented by law enforcement officers involved in the investigation of child pornography

throughout the world.

g.     Individuals whose sexual interest in children or images of children has led them to purchase access to paid websites or other commercial sources of child pornography frequently maintain the financial records of those transactions at their residences.

20.     *Supporting Evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described on the warrant, but also for digital evidence or information that establishes how electronic storage media or digital devices were used, the purpose of their use, who used them, and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the examination of evidence forensically retrieved from digital devices, I respectfully submit there is probable cause to believe that this supporting electronic evidence and information will be on the SUBJECT COMPUTER because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly separable from the hard drive, flash drive, memory card, or other electronic storage media image

as a whole.  Digital data on the electronic storage media not currently associated with any file

can provide evidence of a file that was once on the storage medium but has since been deleted or

edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word

processing file).  Virtual memory paging systems can leave digital data on a hard drive that show

what tasks and processes on a computer were recently used.  Web browsers, e-mail programs,

and chat programs often store configuration data on a hard drive, flash drive, memory card, or

memory chip that can reveal information such as online nicknames and passwords.  Operating

systems can record additional data, such as the attachment of peripherals, the attachment of USB

flash storage devices, and the times a computer, smart phone, or other digital device was in use.

Computer, smart phone, and other digital device file systems can record data about the dates files

were created and the sequence in which they were created.  This data can be evidence of a crime,

indicate the identity of the user of the digital device, or point toward the existence of evidence in

other locations.  Recovery of this data requires specialized tools and a controlled laboratory

environment, and also can require substantial time.

      b.    Evidence on a computer or storage medium can also indicate who has used or

controlled the computer or storage medium.  This "user attribution" evidence is analogous to the

search for "indicia of occupancy" while executing a search warrant at a residence.  For example,

registry information, configuration files, user profiles, e-mail, e-mail address books, "chat,"

instant messaging logs, photographs, the presence or absence of malware, and correspondence

(and the data associated with the foregoing, such as file creation and last-accessed dates) may be

evidence of who used or controlled the computer or storage medium at a relevant time.

c.     A person with appropriate familiarity with how a computer works can, after examining this digital evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of digital evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, electronic storage media and digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on electronic storage media or digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how electronic storage media or a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of programs designed to thwart digital evidence analysis, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## COMPUTERS AND CHILD PORNOGRAPHY

21.    Based upon my training and experience as well as my discussions with others involved in child pornography investigations, computers and computer technology have revolutionized the way in which child pornography is produced, distributed, received and possessed:

18

a.      Child pornographers can now transfer photographs on to a computer directly from a digital camera or from a regular camera by using a scanner.  A computer's electronic storage media (commonly referred to as the hard drive) can store tens of thousands of images at a very high resolution.  In addition, magnetic storage located in host computers makes it possible to use a video camera to capture an image, process that image in a computer with a video capture board, and save that image in another country.  Once done, there is no readily apparent evidence at the "scene of the crime."  Only careful laboratory examination of electronic storage devices can recreate the evidence trail.

b.      A modem allows a computer to connect to another through a telephone, cable, or wireless connection to allow contact with millions of computers around the world. And the Internet and World Wide Web provide child pornographers several relatively secure and anonymous ways to obtain, view and trade child pornography.  Users can find individuals with similar interests or child pornography websites.  Distributors can use membership and subscription-based websites to conduct business.

c.      Collectors and distributors of child pornography can set up an account with a remote computing service that provides e-mail services and electronic file storage.  Evidence of such online storage of child pornography may be found on the user's computer.

d.      Information can be saved or stored on a computer intentionally.  For example, a person may save an e-mail as a file or may save a favorite website in a "bookmark" type file. Information can also be retained unintentionally.  For example, traces of an electronic

communication path may be stored automatically in temporary files or Internet Service Provider

client software.   In addition to electronic communications, a computer user's Internet activities

generally leave traces or "footprints" in the web cache and history files of the browser used.

Internet distributors and recipients of child pornography may be identified by examining the

recipient's computer, including the Internet history and cache to look for "footprints" of the

websites and images accessed by the recipient.  A digital evidence analyst can also recover

evidence suggesting whether a computer contains peer to peer software, when the computer was

sharing files, and the names of the files that were uploaded or downloaded.

    e.    Computer files or remnants of such files can be recovered months or even years after

they have been downloaded onto a hard drive or viewed via the Internet.  Even when such files

have been deleted, they can be recovered by digital evidence analysis tools.  When a person

"deletes" a file on a home computer, the data contained in the file does not actually disappear;

rather, that data remains on the hard drive until it is overwritten by new data.  Deleted files, or

remnants of deleted files, may therefore reside for long periods of time in space on the hard drive

that is not allocated to an active file or that is unused after a file has been allocated to a set block

of storage space (free space or slack space).   In addition, a computer's operating system may

keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been

viewed via the Internet are automatically downloaded into a temporary Internet directory or

cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files,

and the files are only overwritten as they are replaced with more recently viewed Internet pages.

Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when

the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

22.    *Methods To Be Used To Search Digital Devices.*   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the analysis of digital evidence, I know that:

a.    Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals, specialized equipment, and software programs necessary to conduct a thorough search.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique digital evidence analysis tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular digital evidence analysis.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed,

encrypted, or password-protected data.  Recovery of "residue" of electronic files from electronic storage media also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises. Smart phones capable of storing 64 gigabytes, flash drives capable of storing 128 gigabytes, and desktop computers capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain enormous amounts of data.

d.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not separable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

f.    Digital device users can attempt to conceal data within digital devices through a

number of methods, including the use of innocuous or misleading filenames and extensions.  For

example, files with the extension ".jpg" often are image files; however, a user can easily change

the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital

device users can also attempt to conceal data by using encryption, which means that a password

or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.

Digital device users may encode communications or files, including substituting innocuous terms

for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search

techniques and necessitating continuous modification of keyword terms.  Moreover, certain file

formats, like portable document format ("PDF"), do not lend themselves to keyword searches.

Some applications for computers, smart phones, and other digital devices, do not store data as

searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by

a computer, even if the document was never saved to the hard drive, are recoverable by digital

evidence analysts but not discoverable by keyword searches because the printed document is

stored by the computer as a graphic image and not as text.  In addition, digital device users can

conceal data within another seemingly unrelated and innocuous file in a process called

"steganography."  For example, by using steganography a digital device user can conceal text in

an image file that cannot be viewed when the image file is opened.  Digital devices may also

contain "booby traps" that destroy or alter data if certain procedures are not scrupulously

followed.  A substantial amount of time is necessary to extract and sort through data that is

concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

g.    Analyzing the contents of mobile devices can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel analysis challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated analysis tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

h.    Based on all of the foregoing, I respectfully submit that searching any electronic storage media or digital device for the information, records, or evidence subject to seizure pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as digital evidence analysts encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the analysis of the digital evidence.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

i.    In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

i)    The analysis of the contents of the SUBJECT COMPUTER may entail any or all of various digital evidence analysis techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files it contains (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing

electronic "keyword" searches through all electronic storage areas to determine whether

occurrences of language contained in such storage areas exist that are related to the subject

matter of the investigation.

      ii)   In searching the SUBJECT COMPUTER, the digital evidence analysts may

examine as much of the contents of the SUBJECT COMPUTER as deemed necessary to make a

determination as to whether the contents fall within the items to be seized as set forth in

Attachment B.  In addition, the digital evidence analysts may search for and attempt to recover

"deleted," "hidden," or encrypted data to determine whether the contents fall within the items to

be seized as described in Attachment B.  Any search techniques or protocols used in searching

the contents of the seized electronic storage media or digital devices will be specifically chosen

to identify only the specific items to be seized under this warrant.

### <u>CONCLUSION</u>

Based on the above information, there is probable cause to believe that (1) the SUBJECT

COMPUTER described in Attachment A was used to violate Title 18, United States Code,

Sections 2252(a) and 2252A(a), which make it a federal crime for any person to knowingly

receive, distribute or possess child pornography; and (2) the fruits, evidence, contraband and

instrumentalities of these offenses, described in Attachment B are located on the SUBJECT

COMPUTER.

Respectfully submitted,

_____
Thomas Harper
Special Agent
United States Department of Education,
Office of Inspector General


Subscribed and sworn to before me
on January _____, 2016

_____
Deborah A. Robinson
UNITED STATES MAGISTRATE JUDGE

27